Filed 10/20/23  In re Ruben M. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re RUBEN M., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　　　　　v.<br><br>RUBEN M.,<br><br>　　　Defendant and Appellant. | F085927<br><br>(Super. Ct. No. JJD073546)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County.  Juliet L. Boccone, Judge.

Athena Shudde, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and Galen N. Farris, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

A juvenile wardship petition (Welf. & Inst. Code,[1] § 602, subd. (a)) charged appellant Ruben M. with murder and other offenses committed when he was 16 years old. The juvenile court granted the People's motion to transfer appellant's case from the juvenile court to a court of criminal jurisdiction. (§ 707, subd. (a).)

Appellant contends the court's transfer order is not supported by substantial evidence. We affirm.

## BACKGROUND

### I. Petition and Transfer Motion

On June 3, 2021, the Tulare County District Attorney filed a juvenile wardship petition (§ 602, subd. (a)) alleging that appellant had committed murder (Pen. Code, § 187, subd. (a); count 1) and engaged in a criminal street gang conspiracy (Pen. Code, § 182.5; count 2), and criminal conspiracy (Pen. Code, § 182, subd. (a)(1); count 3). As to count 1, the petition alleged a " 'drive-by' " murder special circumstance (Pen. Code, § 190.2, subd. (a)(21)), and a " 'street gang' " murder special circumstance (Pen. Code, § 190.2, subd. (a)(22)), as well as firearm (Pen. Code, § 12022.53, subds. (b), (e)(1)), and criminal street gang (Pen. Code, § 186.22, subd. (b)(1)(C), (5)) enhancements. (Capitalization omitted.) Criminal street gang enhancements (Pen. Code, § 186.22, subd. (b)(1)(C), (5)) were also alleged on counts 2 and 3.

Contemporaneous with the filing of the juvenile wardship petition, the People sought transfer of appellant's case to a court of criminal jurisdiction. (§ 707, subd. (a)(1).)

### II. Transfer Hearing Evidence

The juvenile court commenced a juvenile transfer hearing on February 21, 2023. The following evidence was presented at the hearing.

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

### A. Prosecution Case

#### i. Appellant's Criminal History

As detailed below, the gang-involved murder at issue in the instant case took place on June 5, 2019, when appellant was 16 years old. Appellant was not immediately apprehended in relation to the murder. After the murder, appellant was jumped into the gang. On November 30, 2019, he was arrested after being apprehended with a firearm, ammunition, a grenade, and methamphetamine. He was quickly released from custody in relation to that incident, and the gang put a "freeze" on him. In relation to the November 30, 2019 incident, appellant was placed on informal probation for a one-year term as part of a plea conditioned on deferred entry of judgment (DEJ). During that time, appellant dropped out of the gang and obtained employment. His term on DEJ began on March 17, 2020, and concluded on March 16, 2021, when the juvenile court found appellant was in compliance with the terms and conditions of his DEJ and ordered that his DEJ be dismissed as satisfactory. Appellant was arrested in relation to the murder on June 2, 2021.

#### a. The Murder

Details regarding the murder were provided primarily through the testimony of Christian Bravo, who identified himself as a good friend of appellant. Bravo was a member of Brown Pride Catela (BPC), a Norteño or northerner gang, and appellant was, at the time of the murder, a Norteño associate who wanted to be a gang member. On June 5, 2019, Bravo was drinking at the home of Humberto Contreras with appellant, Contreras, and Edward Moran, the local leader of BPC. Moran told appellant that, "in order to be from the hood, you have to shed blood." Moran took a gun from his waistband and handed it to appellant. Appellant took the gun, although it appeared to Bravo that he "was pressured" and "didn't want to do it." Appellant was stuttering and mumbling, and was jumpy and anxious. Appellant could have declined but, had he done

so, he would have been considered untrustworthy by the gang and would have had to prove himself again.

Moran made a phone call and arranged for a driver. The plan was for appellant and the driver to drive past the victim's house and, if the victim was there, appellant "had to shoot." The victim's house was two or three houses away from Contreras's house. Appellant left with the gun and, ultimately, the victim, Gilberto Serna, was shot and killed.[2]

After the murder, appellant was "jumped in" to BPC at Moran's direction.

### b. November 2019 Incident

On November 30, 2019, law enforcement was investigating a potential transfer of firearms from a residence belonging to Moran. When officers responded, they observed a vehicle exiting the alleyway of Moran's residence at a high rate of speed. Officers pursued the vehicle with their overhead lights activated and the vehicle slowed down. The rear driver's side door of the vehicle opened and appellant exited and ran away. Officers caught up to appellant, leading to a physical altercation wherein appellant was tased. Appellant was carrying a "little backpack bag" that contained baggies of methamphetamine, scales, a Glock-brand handgun with a loaded large extended magazine, and a grenade. Appellant refused to say who he was with that night and denied that he was a gang member.

According to Bravo, appellant was released from custody after a few days and Moran put a "freeze" on him until the gang could determine whether he had spoken to police. Appellant eventually dropped out of the gang.

---

[2] The victim's mother testified that the victim was not involved in a gang or any criminal activity.

### c. Appellant's Statements Regarding the Murder

Appellant first was interviewed regarding the murder on January 16, 2020. He initially denied any involvement in the homicide and told deputies he did not know the people involved. He denied being a member of BPC but acknowledged he hung out with BPC members. He acknowledged he was selling methamphetamine for Moran. He subsequently acknowledged that he knew Contreras and Bravo, and eventually acknowledged he had been at Contreras's house on the day of the murder. He stated they were drinking beer and Bravo eventually drove him home. During the interview, appellant stated, "I know I'm fucked," and asked to call his mother to tell her he was never coming home.

Appellant was interviewed a second time on January 16, 2020. At that time, appellant acknowledged that Moran also was at the house, and another person whose name he did not know, and who had a nose piercing, also came to the house. He stated he had gone to the house to talk with Moran about a situation involving appellant owing $50 to a group of out-of-area Northerners, which resulted from appellant breaking his girlfriend's window. He paid Moran the money. The group was drinking. Moran told appellant he needed to put in work for the gang and that he wanted appellant to shoot a Southerner who lived down the street. Appellant reported to the deputies that he told Moran no, which made Moran mad. Moran said he would do it himself. Appellant first reported that Bravo took him home. He later reported that Bravo left and returned on foot, then Bravo, Contreras, Moran, and someone named Rocket took appellant home in Rocket's car. They drove by the victim's house, but no shooting occurred. Appellant denied being the shooter. He reported that he heard about the shooting later that night.

Appellant next was interviewed on February 4, 2020. He reported that he left Contreras's house because Contreras and Bravo were drinking a lot and were "feeling some type of way." He reported that a man with a nose ring picked him up from Contreras's house and dropped him off at home.

5.

Appellant was then interviewed, and eventually arrested, on June 2, 2021. He again denied involvement in the homicide and denied being present when the homicide was committed. He reported that he was picked up by Contreras, Bravo, Moran and another individual whose name he did not know and taken to Contreras's house. The other men were drinking and doing cocaine, which made appellant uncomfortable. When he stated he wanted to go home, the other men called him names. After about an hour, the men took him home. There was conversation about a neighbor the men had an issue with, but appellant denied being ordered to commit the shooting.

### ii.     Juvenile Detention Facility Behavior

Following his arrest and up to the time of the transfer hearing, appellant spent approximately 18 months in the Tulare County Juvenile Detention Facility (JDF). During that time, appellant was written up on dozens of occasions for conduct including failing to follow rules or instructions, use of profanity, and disrespect of staff. Some staff had overall positive interactions with appellant. Others were fearful of him. During this time, appellant was repeatedly assaulted by other youth in the facility and did not fight back.

Because appellant's conduct in JDF was a significant factor in the juvenile court's decision to transfer appellant to adult criminal court, we review this testimony in detail.

### a.     L. Cano

Probation correctional officer L. Cano testified that he interacted with appellant "pretty frequently." He described appellant as manipulative and stated he "plays the victim a lot." Cano explained that appellant caused issues within his housing unit by "antagonizing other youth." Cano explained that appellant would get attacked by Northern gang members because he was a gang dropout and would "mouth[] off" to gang members and call them derogatory names. Appellant did not fight back when attacked and told Cano this was because he was an adult and did not want to get charged. Appellant also made inappropriate sexual comments to female minors.

6.

According to Cano, appellant would comply with commands some of the time, "depending on his mood for that day." Appellant also would be argumentative "depend[ing] on his mood." When not compliant, appellant would get angry, punch walls, refuse to go into cover position, refuse to follow staff directions, or cuss and yell. Cano opined that appellant is "able to control himself when he wants to," but Cano also has seen appellant get angry and out of control.

On June 28, 2022, Cano wrote a consequence[3] for appellant after appellant was argumentative and did not come out of his room to go to school. When told he was going to receive a consequence, appellant responded that he "didn't care."

On July 23, 2022, Cano prepared an incident report after he observed appellant with a bulge in his sock. Cano asked appellant to give him what was in his sock, and appellant "partially complied" by giving Cano a piece of paper. However, Cano had to redirect appellant a second time to give him the item in his sock. Appellant gave Cano a second piece of paper and stated the paper was part of a class project on Chicano culture. The paper, which Cano confiscated, pertained to the Northern Riders, a gang for dropouts, and contained "a lot of gang-related terms."[4]

Cano explained that "the vast majority of" appellant's behavior included talking back, being disrespectful and rude, and "run[ning] his mouth." (Boldface omitted.) Cano acknowledged such behavior is not unusual for youth in JDF. He acknowledged that appellant had been antagonized by other youth in JDF and had sometimes been attacked unprovoked. Appellant did not associate with any other gang members within his unit but did hang out with one other gang dropout.

---

[3] Cano explained that a consequence documents a minor infraction.

[4] The prosecution's gang expert described the document as a recruitment document containing the Northern Riders' "rules and regulations." To the expert, concealment of this document would indicate the person is either a recruiter or trying to be recruited into the gang.

7.

### b.    S. Hamilton

Deputy probation officer S. Hamilton had occasional interactions with appellant at JDF.  She testified that appellant requires "some redirection."

Hamilton prepared an incident report regarding appellant on July 28, 2022.  On that date, Hamilton called the youth in from physical training due to the heat.  Appellant, who was not participating in physical training that day due to a restriction, attempted to tell her how long physical training should run in the unit.  Hamilton redirected appellant and advised him "to sit on quiet."  Appellant stated something to the effect of, "You think you're running the unit."

Later that evening, during recreation time, appellant asked that a female youth be permitted to sit at his assigned table.  Hamilton denied permission and appellant demanded that she call the institution supervisor on duty so that appellant could speak with him.  Hamilton advised appellant that the proper way to request to speak to a supervisor is by completing a form, and appellant responded something to the effect of, "Don't get smart with me."

Hamilton recalled that she had redirected appellant on other occasions, but she could not recall the reason.  She did not have to redirect appellant often.

### c.    D. Drone

Probation correctional officer D. Drone interacted with appellant once or twice each week.  Drone described appellant "just as another youth" and testified he had no problems with him.  Drone would ask appellant to do work around the unit for him.  Drone had not observed appellant being disrespectful to other staff members.  Drone perceived that appellant acted like a responsible youth.

Drone wrote two consequences regarding appellant, one of which was written on the order of another officer.  Both consequences arose on April 28, 2022.  In one, Drone documented what he had been told by a teacher, which was that appellant twice failed to follow instructions and had to be redirected, after which he became argumentative and

used profanity toward staff. In the other, appellant contacted Drone using an internal intercom system and told Drone he was going to receive a consequence for not going to school. Drone told appellant he deserved a consequence if he was not doing what he was supposed to do. Appellant was upset. Drone explained it was normal for youth to get upset about receiving a consequence.

Approximately one month prior to the transfer hearing, Drone observed another youth come out of his room and attack appellant and another youth. Appellant went into a cover position and did not fight back. Prior to the incident, appellant was sitting at his desk.

### d. D. Doucette

Institution supervisor D. Doucette had daily interactions with appellant. Most of the interactions were pleasant. However, Doucette wrote an incident report regarding appellant on September 21, 2021. On that date, during supervised recreational yard time, appellant and another youth started arguing with each other and threatening to assault each other. Doucette redirected both youth by telling them to "be quiet, to knock it off, to actually separate." Both youth complied. A short time later, however, another verbal altercation broke out and they were told to stop talking to each other and to let it go. Again, both complied. Doucette then overheard another officer redirecting the youth and they went silent. However, another verbal altercation eventually broke out that "got pretty heated" and Doucette put the unit in cover and called for assistance. Appellant was removed from the recreation yard for safety reasons. This incident took place over the course of less than 30 minutes. Doucette testified that incidents like this were not uncommon.

Doucette also wrote an incident report for an incident on May 5, 2022, in which appellant was attacked by another youth. During mealtime, the youth threw milk at appellant and attacked him while he was eating dinner. Appellant went into cover and did not fight back. While the youth was being returned to his cell, he made a comment

9.

asking if he had gotten the right one.  Doucette understood this to mean that the attack was planned in retaliation for appellant's gang dropout status.

Doucette knew that appellant had yelled out to Norteños through the vents in his cell, calling them "scraps."  Appellant also had used the word "scraps" in conversation with Doucette to refer to those who had attacked him.  He would do this loud enough so that others could hear him.  Doucette had sometimes heard appellant antagonizing Norteños from his cell and had redirected him.  Doucette described appellant as "good at following [his] directions" but sometimes he would continue his behavior after redirection.  Appellant sometimes portrayed himself as a victim due to his dropout status.  Appellant also sometimes was provoked by other youth.

### e.    P. Pineda

Probation correctional officer P. Pineda had occasional contact with appellant and had written him two consequences.  On January 15, 2022, Pineda wrote a consequence after appellant slid a "kite" under his door then pulled it back.[5]  Appellant told Pineda that he was playing around.  On January 28, 2022, Pineda wrote another consequence after appellant got up from lunch without permission and walked to his cell door.  Pineda had redirected appellant on other occasions for getting up without permission or doing something without asking an officer beforehand.

### f.    K. Valdivieso

K. Valdivieso is the court school principal for JDF.  She had personal interactions with appellant over the course of his time in JDF.  "Most of the time" appellant did not have to be redirected but, when he did require redirection, he did not like it and the situation became volatile.  Appellant would state, "I'm an adult.  Treat me as an adult. I'm here with little kids and I'm not like them."  He would state that he did not need to be

---

[5] Pineda explained that a "kite" is a triangle-shaped piece of paper tied with a string.  It is considered contraband because youth are not permitted to possess string in their room.

10.

redirected "like a little kid." Whenever appellant was redirected by Valdivieso, he would respond with extreme profanity. He also similarly escalated in response to redirection from teachers. Valdivieso characterized appellant as "very volatile."

Valdivieso gave an example of this behavior. On one occasion, appellant was flirting with a female student. Valdivieso called appellant over and told him, "Gotta stop the flirting." Only appellant and Valdivieso were present during this encounter and an officer was off to the side. The other students were in their cells or not paying attention. Appellant "erupted," stating, "I'm not . . . flirting. I'm not a child molester. . . . I'm a dropout. You don't know how hard it is." He flailed his arms and held both fists up in the air. Valdivieso stepped behind the book cart because of how quickly appellant escalated. Valdivieso explained that she had been at the school for 16 years and could "count on one hand the times [she had] felt . . . the hair on the back of [her] neck go up." An officer escorted appellant to his cell because he was unable to regroup and take redirection. Appellant was angry and beat on the door, and Valdivieso was "greatly concerned." Had Valdivieso known appellant was going to react this way, she would have approached the conversation differently. Valdivieso explained that appellant had also behaved similarly inside the classroom.

Valdivieso explained that the school does "a lot of work with" younger students who have not been incarcerated "to let them know the appropriate behavior," but she does not believe that students who are 19 or 20 years old should require constant redirection. Valdivieso explained, "[W]e're expecting that they've [been] counseled enough from the school and facility to learn how to take a deep breath and just redirect themselves . . . ."

Valdivieso had not seen much improvement with appellant's behavior. She had not seen "the growth that would be expected of someone who's older and someone who's been there long."

11.

Valdivieso testified appellant would regularly state that she did not know how difficult it was for him because he was a dropout. Valdivieso acknowledged that, in fact, she did not have any idea how difficult it was for him. Valdivieso had seen appellant antagonize other students then state, "If I weren't this age, I would beat you up." He then would be beat up by students who were 14 or 15 years old and state it was because he was a dropout. The facility has other dropouts who do not get attacked.

Valdivieso had heard appellant make derogatory comments toward female minors. For example, he made a derogatory comment toward a female student who struggled with math after she asked a question that had already been answered. Appellant was redirected for that incident but did not escalate.

Valdivieso described a few specific incidents with appellant. On one occasion in July 2022, appellant wanted to go back to his classroom and Valdivieso told him he could not do so at that time. Appellant got frustrated that Valdivieso wanted things her way. On August 1, 2022, appellant became frustrated at having to wait for something. Appellant clenched his fist in a threatening manner and raised his arms up to shoulder level. Valdivieso explained that appellant is "large" and "it's pretty intimidating." The behavior made Valdivieso afraid. On September 12, 2022, Valdivieso wrote a narrative after appellant was redirected and responded, "I don't have to fucking listen to you. You're not an officer. You mean shit to me." (Boldface omitted.) More recently, when appellant has been redirected, he stated, "I don't even want to be here. I keep telling my attorneys I don't want to be here and I don't want to be in this unit, but no one will listen to me." Valdivieso explained that there were other tracks and units, and that appellant was not being listened to regarding his placement and was angry about that. Valdivieso understood this to mean that he wanted to be in adult jail.

When appellant arrived at the facility, he stated his desire to get his diploma and he continued with that desire. Appellant liked learning and was focused. Valdivieso did not consider appellant to have any cognitive impairments. He was able to complete his

12.

classwork and projects. He had not been evaluated for an individual educational plan (IEP) because he was older and would be graduating. Having an IEP would not have changed how appellant was treated at the school. Appellant would sometimes grow frustrated with school transitions and would refuse to transition to another school subject if he had not finished his work in the prior subject. Valdivieso characterized this as wanting things "on his own terms" or wanting "special treatment." Valdivieso explained that appellant did not come in angry or in a bad mood, and was "a great student, he does his work and he's pleasant," and he wanted to answer the questions. However, he did not like to be redirected for not following the rules.

Valdivieso acknowledged that appellant's behavior issues were primarily verbal. Appellant has acknowledged to Valdivieso that he needs to "deal with [his] anger issues."

### g.      J. Childress

Institution supervisor J. Childress interacted with minors in the facility "[f]rom time to time." On September 26, 2022, appellant referred to one of the female staff members as "bro." The staff member redirected appellant, stating, "Please don't call me that. I'm not your bro. We're not going to use that term." Appellant responded, "It's not a bad word. What's the big deal?" Childress also attempted to redirect appellant on this issue and appellant again stated it was not a bad word and not a big deal. As Childress walked out of the unit, appellant said, "Well get out," and "Well you make . . . a big ass deal about it." Childress put the unit in cover position and handcuffed appellant. Appellant responded, "This is fuckin' ridiculous. Why do you gotta do that? Don't touch me." After Childress secured appellant in his room, appellant kicked his door and said, "Fuck you, fat bitch." During this incident, the hair on the back of Childress's neck stood up and she felt threatened.

Childress had experienced other incidents where appellant got angry and had noted this was mostly with female staff. In such instances, appellant would puff out his chest and clench his fist in an intimidating manner. Childress had been told that appellant

13.

was making inappropriate comments to female youth in the unit, but she was not aware of the context of the comments.

Childress was aware that appellant had been assaulted because he was a dropout from his gang. She opined that the assaults also could occur because appellant antagonizes others. Appellant did not fight back when attacked. He has said that he does not fight back because he is older and will be charged.

### h.     M. Cardenas

Former juvenile correctional officer M. Cardenas wrote a consequence involving appellant not following instructions on November 26, 2021. Cardenas redirected appellant to be quiet, and appellant responded, "No." He also stated, "No" when asked to leave his food tray at the table. Instead, appellant walked away and put his tray in a stack of food trays.

On December 1, 2021, Cardenas prepared an incident report following a cell search of another room, where Cardenas found a napkin containing appellant's address and a note stating, "Put it where no one can see it. Just write me, and then my family will send it to me."

### i.     J. Beck

Probation correctional officer J. Beck interacted with appellant once or twice each week. On August 3, 2021, Beck wrote an incident report after appellant engaged in an argument with another youth while out at physical training. Appellant told the other youth, "Don't tell me what to do, little kid." Both youth were redirected to stop arguing and failed to do so. Both youth took an aggressive stance. The unit was placed into cover and both youth slowly followed the cover command.

On September 14, 2021, Beck prepared a consequence after appellant kicked his cell door and used profanity, stating, "Let us the fuck out, Beck." This occurred after the unit had been in their cells "for a longer period of time than they wanted to be." Appellant was redirected to calm down but remained upset and received a consequence.

14.

Beck's interactions with appellant were usually positive.

### j.　L. Beltran

Probation correctional officer L. Beltran wrote a consequence regarding appellant on May 13, 2021, after she observed him returning to his cell with a ketchup packet in his hand. Beltran explained that youth are not allowed to take any food to their cells. Rather, youth must eat within 20 minutes and must throw away any remaining food. Appellant hid the ketchup packet in his clothing and Beltran told him to throw it away. Appellant used profanity and denied having a ketchup packet. Beltran found the ketchup packet on his person.

Beltran's other interactions with appellant were positive and he otherwise followed her directions.

### k.　P. Rincon

Probation correctional officer P. Rincon prepared a consequence regarding appellant on April 19, 2022. Appellant and his cellmate were helping clean up the unit at the end of free time. Appellant finished his assigned tasks before his cellmate and began to go to his room as instructed. However, appellant stated he did not want to go to his room and instead wished to wait for his cellmate. Rincon told appellant he would receive a consequence if he did not go, and appellant responded something to the effect that a consequence did not mean anything to him. Rincon again told appellant to go and he complied, but when the cell door closed he called Rincon a bitch and hit his door. Rincon acknowledged that other officers allow youth to stay and wait for their cellmate, but that was not the instruction Rincon gave.

Rincon had not had a lot of bad interactions with appellant but the few she had escalated to profanity. The majority of the time appellant was respectful and followed the rules. However, when he becomes aggravated or upset, "he tends to go farther than it should." When Rincon sees that appellant is getting upset, she tells him to calm down or

asks if he wants to go to his cell. Most of the time, appellant will indicate that he needs to go to his room to calm down.

### l.     T. Alvidrez

Probation correctional officer T. Alvidrez encountered appellant "from time to time." On August 10, 2022, Alvidrez prepared a consequence after she conducted a search of appellant's cell and found a dinner roll and some envelopes with letters and pictures in them. Youth are required to keep such materials in a personal envelope, but these were stuffed in the mattress.

On May 2, 2022, Alvidrez prepared a consequence after appellant became argumentative with a teacher.

On May 10, 2022, Alvidrez prepared a consequence because appellant was sitting in a spot in the recreation yard where he was not allowed to sit. When redirected, appellant got "a little upset" but moved to where he was directed.

In Alvidrez's experience, appellant was receptive with redirection 90 percent of the time, but would otherwise get angry before calming down and listening. However, "he doesn't go into a big argument."

### m.     M. Terriquez

Former probation correctional officer M. Terriquez prepared an infraction for appellant on October 1, 2021, after she instructed appellant to go to his room and he did a cartwheel on the way. Terriquez explained that cartwheels are not allowed.

On September 22, 2021, Terriquez gave appellant a warning when he took a shower for longer than instructed.

On December 16, 2021, Terriquez prepared a consequence after appellant was told not to talk during physical training and failed to comply.

On July 5, 2022, Terriquez prepared a consequence after appellant showered for longer than instructed. When redirected, appellant stated, "I don't give a fuck. I'm

already . . . in trouble." Appellant was told to be quiet but then told another minor, "I'll fuck you up."

Terriquez stated that appellant had a lot of trouble with other youth "just because of his situation." She explained that other minors took "advantage of the fact that he is . . . 18 years old and older, so then they pick on [him]" because they know he cannot fight back. Terriquez usually would choose appellant as her worker for the day, which she described as a privilege, because he has "been there for a while, he knows to do setup, clean-up, and he's not goofing off when doing those things."

### n. L. Hansen

L. Hansen, a teacher at the JDF school, was at one time appellant's teacher. She prepared a write-up on November 18, 2021, because appellant was talking when he was supposed to be quiet. He was redirected, but told Hansen he was not talking and she made a mistake. It was not unusual for appellant to talk back or engage in name calling when redirected.

On another occasion, appellant was moved to another classroom and wanted to find his notes from Hansen's classroom. When the notes could not be found, he accused Hansen of throwing the notes away.

According to Hansen, appellant can get mad very fast and, when mad, he cannot be rationalized with. When angry, appellant starts shaking and stuttering. Sometimes he will clench his fists. He would not raise his arms. He had never threatened Hansen.

Appellant had been redirected for talking. He also had refused to do assignments.

Hansen described appellant as very capable of learning, and stated he can "do a really good job" if he wants to learn or is excited about the subject.

### o. A. Olea

A. Olea was appellant's teacher at the JDF school. Olea wrote appellant up on July 15, 2022. Earlier that day, appellant had "crumbled" up a point log and thrown it on the ground after he had not received certain points to earn treats and incentives.

Approximately 40 minutes later, appellant and another student argued with one another, and continued arguing after being redirected several times. Appellant told the other student, "Do you remember the pact? Fuck you. I'll beat the fucking shit out of you." (Boldface omitted.) Olea called an officer into the room to remove appellant, who refused to leave and became defiant and aggressive toward the teachers in the classroom. Appellant stated to Olea, "Why am I being removed? I'm an adult, what the fuck?" (Boldface omitted.) Olea attempted to redirect appellant and appellant continued to demand an explanation. Olea testified that appellant attempted to intimidate him by puffing out his chest. As appellant left the classroom, he continued to use profanity toward Olea.

Appellant received another write-up from Olea that same afternoon. Appellant was pulled out of class to review his write-up from the morning. When appellant returned to the classroom, he began to discuss his write-up with another student and to laugh about it. This was in violation of facility rules prohibiting discussion of confidential matters.

### p.    F. Cornejo

Probation correctional officer F. Cornejo prepared an incident report regarding appellant on August 8, 2022. On that date, a power outage occurred at the facility that was believed to be due to a fire. As a result, the unit had to evacuate. While Cornejo was preparing to evacuate a group of youth, including appellant, the youth were told to be quiet. Appellant and another youth continued talking and told each other they "had each other[']s backs in case anything happened" out on the yard. Cornejo told appellant and the other youth that he understood their concerns "but whatever you're going to hear, the other kids are going to talk, they're going to say things to you . . . to get you worked up, to get you upset, but just please . . . keep your mouths shut." Cornejo told appellant and his companion that the other youth wanted "to get a reaction out of them." Cornejo knew

18.

appellant to be a gang dropout and believed the other youth also was a dropout. At the time, they were the only two dropouts in the facility.

Once out on the yard with other units, other youth "started saying a bunch of gang slurs, . . . reppin' their hoods or whatever." Some of the comments were directed at appellant. Cornejo noticed that the youth were "strapping their shoes," which Cornejo understood to be something done to get a tighter grip "whenever they're going to start fighting." At one point, one youth stated, "RNF," which represented his "hood." Appellant responded, "Fuck RNF," at which point a bunch of youth got up and a physical altercation started.[6] A "lot of youth" ran toward appellant and the youth he was with. Cornejo attempted to intervene and was assaulted by another youth.

---

[6] The prosecutor asked whether this meant appellant was "asking to get assaulted." (Boldface omitted.) The witness answered affirmatively. The court later clarified whether appellant's response was "the excuse for them to go for it." Cornejo stated that appellant's response triggered the other youth's attack.

The prosecutor repeatedly elicited testimony suggesting appellant was responsible for being assaulted because he verbally antagonized gang members. The prosecutor elicited testimony that appellant is "constantly getting attacked . . . due to him not being quiet and just mouthing off to them"; that he antagonizes others by glaring at them or making comments and, "[t]o a certain extent" is "inviting being assaulted" (boldface omitted); that he may be criminally sophisticated because "he's able to antagonize other people to a point where they want to attack him"; and that he "antagonizes and then they attack, and then he'll state, 'I'm a dropout. That's why this is happening.' " The prosecutor also asked numerous questions suggesting the same: "[B]ased on your role as a supervisor, is it your understanding that he's getting assaulted because he antagonizes others?"; "[W]hen those altercations actually happen, you don't know if he's the one that's antagonizing them and causing them to attack him?"; "[I]f I were to tell you that several witnesses have testified that he would . . . call[] the active Norte[ñ]os and Sure[ñ]os names to the point where he antagonizes them, thus causing the attacks, what would that indicate to you?" (Boldface omitted.)

It is unusual for a prosecutor to suggest that the victim of an assault caused the assault by verbal provocation and name calling. This is likely because doing so is contrary to settled law. Name calling alone is generally insufficient to justify an assault or battery. (See *People v. Mayes* (1968) 262 Cal.App.2d 195, 197; see also CALCRIM No. 917.)

Cornejo knew there would be a risk of this type of altercation on the yard because appellant and "the other youth had always been targeted by the rest of the facility for being Northern dropouts. And I believe the North is basically our whole population in the pod."

**B.     Defense Case**

**i.      Prior Delinquent History**

Appellant presented evidence that, in relation to the November 2019 incident, he was placed on informal probation through DEJ for a one-year term beginning March 17, 2020. As terms of his DEJ probation, appellant was required to participate in drug and alcohol counseling and anger management counseling; complete 80 hours of community service; attend school regularly; obey all local, state, and federal laws; refrain from the use or possession of alcohol or drugs; complete individual counseling; and report to probation as directed.

A probation officer had contact with appellant on March 20, March 27, and April 3, 2020, at which time appellant confirmed he had enrolled in individual counseling. The probation officer then attempted to contact appellant by phone on May 1, June 15, and July 23, 2020, without success. Due to COVID-19 restrictions, the officer was not permitted to attempt to locate appellant in person. However, on August 7, 2020, the officer went to appellant's address and was told that he had moved. Appellant was required to update his address with probation but had not done so. On August 14, 2020, the officer went to an updated address he received for appellant, but appellant was not there. The officer eventually encountered appellant at the new address on September 11, 2020. Appellant told the officer he rarely left the residence. Thereafter, a different probation officer was assigned.

The new probation officer attempted to contact appellant by phone on November 3, and December 29, 2020, as well as February 19, 2021, without success. On March 3, 2021, the probation officer made contact with appellant at his residence.

Appellant reported that he was working at a church.[7]  He was not enrolled in school.  Appellant met with the probation officer again the following day, at which time he submitted to a urine test, which was positive for tetrahydrocannabinol (THC).  He reported that he had dropped out of the gang and was receiving death threats.  On March 8, 2021, appellant called the probation officer to inform her he had enrolled in school.  The officer was able to confirm appellant's enrollment but did not thereafter attempt to confirm whether appellant attended any classes.

Over the course of his time on DEJ, appellant completed individual counseling, which included counseling on anger management.  He did not complete drug and alcohol counseling.  Because community service was not available due to COVID-19 restrictions, appellant instead was required to write, and did write, a two-page essay.  He had no negative law enforcement contacts.

The probation officer recommended that appellant be found in compliance with the terms and conditions of his probation based on his lack of negative law enforcement contacts, completion of counseling, enrollment in adult school, and completion of a community service essay.  On June 16, 2020, the juvenile court found appellant was in compliance with the terms and conditions of his DEJ.  On March 16, 2021, the court again found appellant was in compliance with the terms and conditions of his DEJ and ordered that his DEJ be dismissed as satisfactory.[8]

---

[7] G. Marroquin described himself as a handyman and testified that appellant began assisting him with work sometime in 2020, or possibly in January 2021.

[8] At the transfer hearing, the juvenile court took judicial notice of the court's minute orders regarding the disposition of appellant's DEJ but stated, "I will note for the record that I don't find that is accurate . . . [¶] . . . [¶] . . . [b]ased on the testimony that I heard."

### ii.    JDF Behavior

Appellant presented some favorable testimony from probation officers as part of the defense case.

Probation officer M. Morales testified that appellant was polite and respectful toward him, even when he was not having a good day.

Probation correctional officer C. Ayala testified that he had "some good interactions" with appellant. Ayala had successfully counseled appellant on occasions when he had been upset. However, Ayala also had prepared consequences for appellant in the past, including for failing to follow directions and passing contraband.

Probation correctional officer I. Silva Alviar testified that appellant had called her "birdbrain" but that it is common for youth to be disrespectful in the facility.

Probation correctional officer K. Roman testified that appellant would help her clean the day area and the showers. She would choose him as her worker because he always followed instructions. However, she had also prepared a report based on appellant and another youth continuing to talk disruptively to one another after being redirected.

Officers testified that appellant was assaulted a number of times in JDF. Appellant would cover his face and head with his arms and did not fight back.

### iii.    Appellant's Social History

Appellant presented evidence that he is the fourth child of his mother, and each of the children in his family has a different father. One of his older siblings suffers from schizophrenia and bipolar disorder. Another of his siblings was adopted by another family.

Appellant was conceived when his mother was raped. Appellant learned this when he was 10 or 11 years old.

Appellant had a stutter problem that began in early childhood. He received some speech therapy in school.

22.

When appellant was approximately two years old, he was found unattended in a pool in the family's yard. He was taken to the hospital after the incident but received no further follow up.

Forensic social worker E. Brown reviewed six incidents of Child Welfare Services involvement with appellant and determined that appellant was "neglected, to an extreme degree." It appeared to Brown that appellant's sisters were the focus of Child Welfare Services, and that appellant "got kind of passed over." The Child Welfare Services reports documented chaos, instability, filth, lack of sanitation, and other dangerous conditions in the houses where appellant lived. There were drugs and weapons in the homes. Other relatives in the homes had their children removed from them. Social workers could not enter one of the homes without law enforcement due to people in the house being "known dealers and gang members [that] had weapons." There was gang activity and violence in the homes, including fighting among appellant's siblings and cousins.

In one instance, Child Welfare Services intervened in response to appellant's oldest sister threatening to kill the younger sister in the house. The reports also documented appellant's oldest sister's psychotic episodes. This sister would hit appellant regularly and his mother would hide him in the closet.

Appellant attended multiple schools. It did not appear to Brown that appellant was "appropriately assessed" for learning disabilities.

### iv. Mental Function and Development

Clinical neuropsychologist C. Velazquez evaluated appellant for neurocognitive deficits. Velazquez opined that appellant met the criteria for a neurodevelopmental disorder secondary to a traumatic brain injury. Her opinion was based on medical, academic, and law enforcement records, as well as meeting with appellant and administering tests. Velazquez attributed the brain injury to loss of oxygen from the near-drowning incident. She relied on medical records prepared immediately after the

near-drowning incident to determine appellant's presentation was suggestive of a brain injury.

The results of Velazquez's testing of appellant were varied, which she stated was consistent with a brain injury in early childhood. His results showed disorganization, attention and coding problems, and severe impairment of visual-spatial skills. He had developed some ability to mask or compensate for these deficits.

Velazquez described appellant's visual and verbal memory responses as one of the most notable findings of her testing. Appellant had difficulty encoding visual and verbal information and could not recall information presented to him 20 or 30 minutes prior. Velazquez attributed this difficulty to the near-drowning incident. However, when given time to learn information, he was able to recall it. Velazquez explained that "his memory system is working, but he's having clinically significant difficulty being able to pull that information out and use it appropriately."

Appellant's simple attention was in the average range, which was a strength for him. However, attention in math was in the borderline impaired range. His verbal fluency was in the average to high-average range, but he struggled to communicate and understand. Additionally, his fund of language knowledge and his ability to reason were in the borderline impaired to low-average range. His fine motor skills were in the average range and appropriate.

Appellant scored in the borderline impaired range with regard to impulsivity. He made numerous impulsive errors and had a substantial number of violations of the rules required to take the test. Velazquez explained that this showed he struggles significantly in certain areas of executive functioning but is able, with trial and error, to eventually "pull it together to not create so many violations." Velazquez related these deficits to appellant's inattention, and his impulsive and disrespectful behavior in JDF.

Appellant provided an elevated response to "a lot of the indicators of trauma." Velazquez recommended further testing to determine if appellant had complex posttraumatic stress disorder.

Velazquez surmised that appellant had "really good cognitive reserve" and ability to hide his deficits, but required coping skills and supportive structures to help him achieve and regulate his emotions. Velazquez opined that he is able to use the appropriate cognitive reserve to be rehabilitated. In Velazquez's opinion, appellant required an IEP to be able to demonstrate his knowledge of information in a format, such as a multiple-choice test, that would allow him to demonstrate his knowledge retention. Velazquez further opined that it would require "a lot of trial and error" to determine the type of academic structure that would best work for him. He will require "appropriate tutors and accommodations" for exams. Velazquez explained that it is common with nonvisual disabilities like appellant's that educators see him as having a behavior problem, rather than a cognitive problem.

Velazquez opined that, in the outside world, appellant will require a "higher level of support" to make sure he does not fall behind and can obtain housing and appropriate work. She opined that appellant would prefer manual jobs that are repetitive and consistent.

Appellant scored a 73 on the IQ test Velazquez administered, which equates to borderline intellectual functioning. However, depending on appellant's adaptive and behavioral functioning, his IQ score could also indicate a mild intellectual disability. Velazquez did not test appellant's adaptive and behavioral functioning skills, but recommended referral to the Central Valley Regional Center (CVRC) for this purpose.[9]

---

[9] CVRC coordinates services for individuals with developmental and intellectual disabilities.

Velazquez acknowledged she had little familiarity with the programs that would be available to appellant in either the juvenile or prison setting. She also acknowledged that appellant had not been diagnosed with a traumatic brain injury by the medical personnel who had seen him immediately after the near-drowning incident.

Subsequently, CVRC determined appellant was eligible for services based on his borderline intellectual functioning, and his substantial deficits in learning, self-care, self-direction, capacity for independent living, and economic self-sufficiency. CVRC cannot provide services while appellant is in custody. However, upon release, appellant would be eligible for day programs, independent living services, vocational training, and mental health therapy. Appellant will have access to these services for life and would be monitored on at least a quarterly or annual basis. All CVRC services are voluntary.

### v. Amenability to treatment

#### a. S. Howard

Clinical and forensic psychologist S. Howard testified as an expert witness in forensic clinical psychology. She evaluated appellant for purposes of the transfer hearing. She interviewed appellant, which included psychological testing, and reviewed documents including police and probation reports, behavioral incident reports from JDF, Velazquez's neuropsychological report, and mental health treatment reports from appellant's provider while on DEJ and the JDF mental health provider.

Howard administered a personality assessment inventory and a risk sophistication treatment inventory. On the personality assessment inventory, appellant had elevated results on scales relating to traumatic stress, depression, paranoia, anxiety, and past drug and alcohol use. He also had elevations on the scale called "borderline," which relates to forming an identity and difficulties with interpersonal relationships. Appellant scored very low on the treatment response scale, indicating that he is aware he has some problems and needs help, believes people are able to change, and is likely to respond to treatment.

The risk sophistication treatment inventory is designed to assess for risk of dangerousness, sophistication, maturity, and amenability of treatment of juveniles. Howard acknowledged that use of this inventory with appellant, who was 19 years old at the time, was nonstandard. Compared to other youth in juvenile detention, appellant's risk of dangerousness was "right around the middle." In Howard's opinion, appellant was not displaying any emergent psychosis and his prior offenses did not reflect planning or predatory behavior. Appellant also scored in the middle on sophistication and maturity. Appellant scored high on autonomy, which made sense in light of his background of neglect and his having lived fairly independently for some time. He scored in the middle for cognitive capacities. He scored higher than Howard expected on emotional maturity and ability to show restraint. He scored high on amenability to treatment. This score was based on appellant having a treatable mental illness, his motivation to change, and his consideration and tolerance of others.

Howard noted that appellant had a diagnosed intellectual disability based on evaluations by Velazquez and CVRC, and Howard opined that appellant also met the diagnostic criteria for having major depressive disorder with anxious distress and complex posttraumatic stress disorder. Howard believed the complex posttraumatic stress disorder diagnosis was appropriate in light of appellant's difficulty managing emotions and negative thoughts, attachment issues, and his social history involving neglect and trauma during his developmental years. As a result of his complex posttraumatic stress disorder, it is difficult for appellant to regulate his emotions.

Howard acknowledged the seriousness of appellant's crime but opined that he did not display a high degree of criminal sophistication. She noted that appellant was the youngest person at the scene, and she opined that appellant's neurocognitive disorder meant he did not have the personality to put a lot of thought into planning this type of crime. Additionally, he was immature in his emotional regulation and ability to deal with other people. He also did not exhibit predatory behavior, such as acting out toward

someone younger or weaker than himself. Appellant also had a delayed sense of identity. Appellant was still forming an idea of who he wanted to be and how he wanted to move forward in the world. It appeared to Howard that appellant began making positive changes in his life during his time on informal probation.

Howard opined that appellant's progress since the time of the crime indicates he can be rehabilitated. His mental illness is manageable and treatable. He does well with structure. His still-forming identity meant there was room for growth. He expressed remorse for and understanding of his crime and assumed responsibility for it. He had dropped out of the gang. He had no record of violence while in custody.

Howard acknowledged appellant's JDF history included several instances of him failing to follow directions, arguing, talking back, and getting angry. Howard noted that some of this behavior was developmentally appropriate for youth who are figuring out their identity and do not want to be told what to do. In Howard's opinion, the behavior did not speak to future violence or rehabilitation but was normative to appellant's peer group. She noted appellant's aggression was not directed toward someone weaker. Nonetheless, she agreed that the behavior was "not ideal" and needed to be addressed. She also noted that some of appellant's disciplinary issues at JDF involved food hoarding, which is common in youth who were raised with food insecurity. She therefore believed this was a mental health issue rather than a behavioral issue, and it did not correlate with future violence.

Howard opined that appellant had made significant progress with the minimal programming he received in JDF. She believed he could be rehabilitated prior to the expiration of juvenile court jurisdiction with the continuation of such programming, even without considering any additional programming that may be available to him after disposition.

Howard had concerns regarding appellant's education and opined that he needed an IEP. She explained that the IEP would help with appellant acting out behaviorally, and would address his emotions and ability to self-regulate.

The prosecutor asked Howard about incidents in which appellant "gets aggressive, he clenches his fists, [and] puffs up his chest" in response to staff, "[i]n an effort to intimidate."[10] (Boldface omitted.) Howard pointed out that he was not physically assaulting staff or taking advantage of younger or weaker youth. Howard acknowledged that appellant needed to learn how to stop this behavior, and he needed time to learn to trust adults because of his traumatic past. It made sense to Howard that appellant was "missing the building blocks" that would teach him better emotional self-regulation. She

---

[10] A heated exchange took place during cross-examination when the district attorney posed the following question: "Now, if I were to tell you that several witnesses have testified that he would go in his cell and start banging on the door and calling the active Norte[ñ]os and Sure[ñ]os names to the point where he antagonizes them, thus causing the attacks, what would that indicate to you?" (Boldface omitted.) Howard responded, "If we have a youth that is getting beating [*sic*] up at home, we call that domestic violence. If we have a youth that's getting beat up in a facility, that is institutional violence. And you never solve that violence by blaming the victim." Howard further stated, "If he is being attacked, he is a victim."

The prosecutor asked that Howard be admonished because it was "not appropriate for her to address [the district attorney] in such a way." The court declined to admonish the witness. The prosecutor stated to Howard, "But that did not answer my question. So, do you need the question read again?" (Boldface omitted.) Howard stated, "It's an inappropriate question and my answer will be no, he is not provoking the attacks. It's institutional violence and needs to be handled a different way." The prosecutor asked, "And how do you know that?" (Boldface omitted.) Howard responded, "We never excuse violence as a person being provoked. Ever." When the prosecutor again stated that this did not respond to the question, Howard further explained, "If he is using words, even if they're inappropriate and it's a way of self-preservation, not ideal, but, no, that does not change my opinion."

The prosecutor cited this exchange in closing argument to characterize Howard as "defense oriented, especially based on her outburst in court after being asked a simple question about whether [appellant] antagonizing active gang members contributed to his attacks."

acknowledged this would continue to be a struggle for appellant but it did not mean he could not be rehabilitated.

### b. Brown

Brown also opined on appellant's amenability to treatment. She opined that appellant had made substantial progress in JDF. He showed insight into his crime and acknowledged the trauma inflicted on his victim's family. He articulated goals for the future. In Brown's opinion, appellant could be rehabilitated by age 25 if provided adequate services, to include education, training, and therapy, in a structured environment. She was not concerned that appellant continued to have angry outbursts, given that he was not fully rehabilitated. She also noted that appellant had withstood attacks without responding violently or inflicting injury on peers or staff. She noted that availability of anger management and substance abuse services in prison was dependent on numerous factors, and these programs are guaranteed only for those with a parole date within three years.

### vi. Mental Health Treatment in JDF

Mental health clinician C. Navarro saw appellant approximately weekly at JDF from April 2021 through June 2022. At that time, Navarro's contract terminated and the JDF mental health services were taken over by another provider. Navarro's sessions with appellant were at appellant's request and lasted on average approximately 15 minutes. At his first session, appellant was anxious and distressed. The sessions focused on using coping skills.

Navarro saw appellant mature over time, advocate for himself, and "try his best." Appellant showed restraint with other youth in the facility and was committed to not getting in more trouble. Navarro would help appellant process his conflicts with staff so that appellant would not make things worse for himself. Appellant was able to utilize the tools Navarro provided. According to Navarro, appellant showed maturity compared with others in JDF.

30.

Appellant also attended group counseling at JDF with alcohol and drug counselor A. Rose. He attended sessions twice a week for approximately eight months. Appellant was engaged and able to identify triggers and emotions that led to alcohol and drug use in the past. Appellant would occasionally, but rarely, decline to answer questions regarding anger. He was respectful and got along with other youth in the group. Some of the youth in the sessions were gang members. No fights ever occurred in this group.

Appellant also attended group psychoeducational sessions with licensed marriage and family therapist V. Lopez. He attended sessions twice a week beginning in September 2022 and continuing through the transfer hearing. The sessions covered subjects such as mindset, anger management, and dealing with stress. Appellant was respectful to Lopez and a majority of other participants. On one occasion, appellant got upset but was able to remain calm and put his head down. Appellant is aware of his issues and is continuing to work on them. Appellant also had requested to see, and was seen by, Lopez on an individual basis approximately four times.

Appellant also completed a parenting program called 24/7 Dad. Appellant sought out this program and requested to attend. He did well and made suggestions to improve the program, which were adopted.

Appellant also attended a program called Anger Management for Substance Use Disorders. He was not able to complete this program because it was discontinued.

### vii. Available treatment programs

JDF offers short-, mid- and long-term programs, and a secure youth treatment facility, which JDF calls the Supportive Youth Treatment Program (SYTP). Services provided in the SYTP include counseling through Phoenix House, schooling through the Tulare County Office of Education, programming through probation correctional officers and probation officers, probation vocational instruction, and other outside programming including religious programming.

31.

In SYTP, Phoenix House assesses a minor within 72 hours of commitment and creates a treatment plan.[11] After 30 days, the youth and a mental health therapist develop more specific goals and a plan for working toward those goals. Thereafter, the treatment plan is evaluated every 90 days. The treatment plan addresses seven domains or issues: substance-use disorders, mental health, social skills, medical issues, family issues, school, and legal issues.

Phoenix House provides evidence-based group and individual counseling. Minors attend group sessions for four-to-six hours per week and individual therapy for 45-to-60 minutes per week. Between all the programming and other contacts, youth meet with Phoenix House staff for approximately 10 hours per week. The programming is individualized and has many options for youth in the facility. The counseling includes cognitive groups, social skills groups, emotionally focused groups, behavioral groups, rehabilitative counseling, life skills groups, and individual, family, and rehabilitative therapy. Phoenix House counseling primarily involves cognitive behavioral therapy and dialectical behavioral therapy. Phoenix House also offers several types of anger management counseling. Additionally, because youth are housed at the local level, Phoenix House is also able to offer family counseling. Phoenix House counselors are trained in trauma-informed care. Six Phoenix House employees work at JDF. The goal of this programming is to successfully reintegrate youth into the local community.

There is some overlap in the counseling provided in SYTP and in the short-, mid-, and long-term programs, but there also is some counseling that is only available in SYTP. The services appellant would receive through Phoenix House would be "totally different" from those he was then receiving at JDF.

---

[11] Phoenix House also provides programming in prison.

SYTP currently includes vocational instruction in construction, and may potentially expand to art and computers. Plans also include adding a turf field and various sports courts, as well as a walking trail and garden.

Regular multidisciplinary team meetings are held in the SYTP. A meeting is held for each youth at least every six months. Representatives of Phoenix House, the school, and probation attend; the youth and the youth's parents and attorney may also attend. The team meets to determine the youth's ongoing need for different types of services.

Aftercare case managers engage with youth throughout their program and for a year after release. The aftercare program can assist youth in obtaining community services after release.

### C. People's Rebuttal

Probation correctional officer V. Roque was assigned to the transport unit on March 2, 2023,[12] when he transported appellant. That afternoon, Roque was stationed five-to-seven yards outside a holding cell door while appellant spoke with his attorney. Roque overheard minor state, "If I get tried as an adult, I'm going to attack the D.A." Roque did not hear any other part of the conversation. Roque notified a court deputy and a JDF institution supervisor of the statement.

## III. Juvenile Court Transfer Order

The juvenile court granted the People's motion to transfer the case to the jurisdiction of the criminal court. The court explained its ruling as follows:

> "Okay. These hearings are always very hard because with my nine years being in juvenile court on a regular basis, I see all kinds of horrible situations that kids are involved in. The problem with that is, is that whether or not that can be repaired is really what we're addressing here in juvenile transfer hearings. And there are so many different factors that fall into that category.

---

[12] On March 2, 2023, several defense witnesses testified in the transfer hearing.

33.

"But what the Court looks, at having dealt with a lot of these cases, and I had other transfer hearings involving similar circumstances and similar situations, is the Court being able to be convinced that rehabilitation within the time available is realistic.

"In this case, there's a lot of different concerns that the Court has with regard to that. First of all, Mrs. Valdivieso is somebody that I have heard testify many times. And I've never heard her testify in the manner that she did in this, as far as being afraid of [appellant] actually causing her harm. She's a special education teacher, and yet, didn't agree with the counselors or the social workers that testified with regard to the IEPs, et cetera. She's seen [appellant] a whole lot more time than they see [appellant]. That's something that concerns me.

"There also is the fact – and I will agree that Probation did let him down with regard to his DEJ. I've never seen such a lack of compliance in DEJ being found satisfactory. The problem with that is, though, the part where [appellant] had a choice, he chose not to take advantage of the situations that he was supposed to. He didn't report, he didn't – he could have made it work out better. I'm not blaming him for that, I'm just saying that I think he was given a false sense of accomplishment by them saying it was a satisfactory dismissal. So, that's on the Probation Department, but it also – it also shows that he really was – he only did the bare minimum he had to do in order to get where he wanted to be. And that's not a good sign for his future success in this type of situation.

"He has grown up with a lot of violence, and that's extremely unfortunate, but part of parcel [sic] of that, he learned a lot of manipulative behaviors, which he has exercised consistently while being in the Juvenile Detention Facility. He does prey on people that he feels are in a weaker position, and he does like to create himself as a victim in other situations. He's very manipulative. There's no doubt about it. And I'm sure it results – it's a result of the life he's lived, where he's had to come up with ways of dealing with things, such as when his mother would attack him and he's hiding in the closet. He figured out a way to avoid getting hurt by doing that. It's unfortunate that he had to do that, but that showed he was capable of doing that.

"On the flip side, he doesn't show that same resourcefulness in Juvenile Hall, in the Juvenile Detention Facility.

"So, I have big concerns with regard to his history of violence, his manners of how he deals with life using violence, and the amount of time that we have available for the rehabilitation.

34.

"I don't think that – I'm not saying that the Phoenix program is necessarily flawed in any way, shape, or form, but I don't know that it would sufficiently address his behaviors in the amount of time we have available. He – his constant assertion that he should just – he should be treated differently just because he's an adult, his constant back talking, his constant creating situations, you know, antagonizing people that he knows are going to respond in kind because the group he came from. And I just – I just don't think there's enough time and enough resources available to get him where he needs to be when we lose jurisdiction of having to help him.

"I think that by clear and convincing evidence that I don't think he would have the sufficient tools to do that in the time allowed. The reason I keep talking about the time allowed is because I think that he is the candidate that's best addressed by the early parole from the youthful offender situation. I think that could offer him some very good outcomes.

"I don't think this is going to work for him, and so I am going to find that he is not amenable to the treatment part of it. In other words, based on the degree of criminal sophistication, based on the amount of time and the lack of progress he's made in the rehabilitation that he has received – some of it he has made some progress, but what I would expect from the amount of time he's been there, based on the circumstances and gravity of the offenses, I do find by clear and convincing evidence that he should be tried as an adult."[13]

## DISCUSSION

### I. Applicable Law

Enacted by voters in November 2016, "Proposition 57 prohibits prosecutors from charging juveniles with crimes directly in adult court. Instead, they must commence the action in juvenile court. If the prosecution wishes to try the juvenile as an adult, the juvenile court must conduct . . . a 'transfer hearing' to determine whether the matter should remain in juvenile court or be transferred to adult court. Only if the juvenile court transfers the matter to adult court can the juvenile be tried and sentenced as an adult." (*People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, 303.) In determining whether to transfer a minor to a court of criminal jurisdiction, the juvenile court "shall consider the

---

[13] Appellant was arraigned in the criminal matter, but the criminal proceedings were stayed pending disposition of this appeal.

criteria specified in" section 707, subdivision (a)(3), subparagraphs (A) to (E). (§ 707, subd. (a)(3).)

Until recently, "the governing law and the corresponding Rule of Court required the petitioner to establish by a preponderance of the evidence that 'the minor should be transferred to a court of criminal jurisdiction.' " (*In re S.S.* (2023) 89 Cal.App.5th 1277, 1284.) "In making that decision the juvenile court was required to consider five criteria [set forth in section 707, subdivision (a)(3), subparagraphs (A) to (E)]: (1) the degree of criminal sophistication, (2) whether the minor . . . can be rehabilitated prior to the expiration of the juvenile court's jurisdiction, (3) the minor's previous delinquent history, (4) the success of previous attempts by the juvenile court to rehabilitate the minor and (5) the circumstances and gravity of the offense alleged in the petition to have been committed by the minor." (*In re E.P.* (2023) 89 Cal.App.5th 409, 415.)

Effective January 1, 2023, Assembly Bill No. 2361 (2021-2022 Reg. Sess.) (Assembly Bill No. 2361) amended section 707, subdivision (a)(3) to provide in relevant part as follows: "In order to find that the minor should be transferred to a court of criminal jurisdiction, the court shall find by clear and convincing evidence that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court. In making its decision, the court shall consider the criteria specified in subparagraphs (A) to (E) [of section 707, subdivision (a)(3)], inclusive. If the court orders a transfer of jurisdiction, the court shall recite the basis for its decision in an order entered upon the minutes, which shall include the reasons supporting the court's finding that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court." (Stats. 2022, ch. 330, § 1; see § 707, subd. (a)(3); see also *In re E.P.*, *supra*, 89 Cal.App.5th at pp. 415-416.)

Following Assembly Bill No. 2361, the minor's amenability to rehabilitation is "the ultimate question for the court to decide." (*In re E.P.*, *supra*, 89 Cal.App.5th at p. 416.) "Nevertheless, in deciding that question, the amendment requires the court to

consider the same five factors listed in the previous version." (*Ibid.*) Now, however, "[t]he analysis of the five criteria set forth in the statute should be focused through the lens of amenability to rehabilitation." (*In re S.S.*, *supra*, 89 Cal.App.5th at p. 1288.)

As stated, Assembly Bill No. 2361 also raised the standard of proof to "clear and convincing evidence." (Stats. 2022, ch. 330, § 1; see § 707, subd. (a)(3); see also *In re S.S.*, *supra*, 89 Cal.App.5th at p. 1286.) " 'The standard of proof known as clear and convincing evidence demands a degree of certainty greater than that involved with the preponderance standard, but less than what is required by the standard of proof beyond a reasonable doubt.' [Citations.] ' "Clear and convincing" evidence requires a finding of high probability.' [Citations.] Courts have also described the standard 'as requiring that the evidence be " 'so clear as to leave no substantial doubt'; 'sufficiently strong to command the unhesitating assent of every reasonable mind.' " ' " (*In re S.S.*, at p. 1286.)

"[T]he fundamental question before an appellate court reviewing for sufficiency of the evidence is the same, regardless of the standard of proof that applied below: whether any reasonable trier of fact could have made the finding that is now challenged on appeal." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1005.) "[W]hen presented with a challenge to the sufficiency of the evidence associated with a finding requiring clear and convincing evidence, the court must determine whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by this standard of proof." (*Ibid*.) In other words, "the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true." (*Id.* at pp. 995-996.) In so doing, we "view the record in the light most favorable to the prevailing party below and give due deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Id.* at p. 996.)

## II. Juvenile Court's Statement of Reasons

Citing *C.S. v. Superior Court* (2018) 29 Cal.App.5th 1009, 1035, and section 707, subdivision (a)(3), appellant asserts: "Foundationally, the trial court's order does not specifically identify and explain how each of the five statutory criteria affected its decision." This is the entirety of appellant's argument on this point. He has failed to state this point under a separate heading or subheading summarizing the point and has failed to support the point with argument as required by California Rules of Court, rule 8.204(a)(1)(B).

Regardless, the point is without merit. *C.S. v. Superior Court* articulated the juvenile court's duties under the former version of section 707, subdivision (a)(3). (*C.S. v. Superior Court*, *supra*, 29 Cal.App.5th at p. 1035.) There, the juvenile court considered each of the five statutory factors but "made few clear and explicit findings as to which criteria weighed in favor of transfer, which criteria weighed against transfer, and which criteria were neutral." (*Ibid.*) Nor did the juvenile court " 'articulate its evaluative process' in determining how the different statutory criteria affected its transfer decision." (*Ibid.*) Rather, the juvenile court's conclusory ruling did not allow the appellate court to evaluate the juvenile's claim that the court "improperly weighed one criterion over the other criteria." (*Ibid.*)

As amended, section 707, subdivision (a)(3) requires the juvenile court to provide "the reasons supporting the court's finding that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court." Although the juvenile court must consider the five statutory factors specified in section 707, subdivision (a)(3), subparagraphs (A) to (E), the court is no longer tasked with weighing these factors against one another to determine whether to transfer a minor to adult court. (See *C.S. v. Superior Court*, *supra*, 29 Cal.App.5th at p. 1035.) Rather, the statute requires the juvenile court to state its reasoning with regard to the ultimate question of the minor's amenability to rehabilitation. Here, the juvenile court did so at length. Unlike the record

in *C.S. v. Superior Court*, the ruling here is sufficient for us to evaluate appellant's claim of evidentiary insufficiency.  (See *ibid*.)

### III.    Sufficiency of the Evidence

Appellant contends substantial evidence does not support the juvenile court's finding that he is not amenable to rehabilitation prior to the expiration of juvenile court jurisdiction.[14]  We disagree.

In finding that appellant was not amenable to rehabilitation while under juvenile court jurisdiction, the juvenile court considered appellant's criminal sophistication (§ 707, subd. (a)(3)(A)(i)) and his previous attempts at rehabilitation within the juvenile system (*id*., subd. (a)(3)(D)(i)).  To a lesser extent, the juvenile court also considered the

---

[14] At the time of the transfer hearing, appellant was 20 years old.  The juvenile court could retain jurisdiction over him until at least age 25.  (§ 607, subd. (c); see § 707, subd. (b)(1); see also § 1800.)

Appellant contends the juvenile court ignored section 607, subdivision (c), which provides for retention of juvenile court jurisdiction over certain persons until the person "attains 25 years of age, or two years from the date of commitment to a secure youth treatment facility pursuant to [s]ection 875, whichever occurs later."  Appellant also contends the juvenile court ignored section 1800, which permits the prosecutor to petition for an extension of juvenile court jurisdiction under certain circumstances.  (*O.G. v. Superior Court* (2021) 11 Cal.5th 82, 93 [§ 1800, subd. (a) "permits the prosecutor to petition for an extension of juvenile court jurisdiction, even past the age of 25, if discharging a juvenile offender 'would be physically dangerous to the public because of the person's mental or physical deficiency, disorder, or abnormality that causes the person to have serious difficulty controlling his or her dangerous behavior' "].)  We additionally note that section 607 recently was amended to provide that the juvenile court "may retain jurisdiction over a person who is 25 years of age or older for a period not to exceed two years from the date of disposition if the person is found to be a person described in Section 602 by reason of the commission of an offense listed in subdivision (b) of Section 707."  (§ 607, subd. (d).)

In transferring the case, the juvenile court stated appellant is a "candidate that's best addressed by the early parole from the youthful offender situation."  Thus, it appears the juvenile court viewed appellant as requiring a substantially longer period to rehabilitate than that provided for under juvenile law, even taking sections 607 and 1800 into account.  (See Pen. Code, § 3051.)

circumstances and gravity of the alleged offense (*id.*, subd. (a)(3)(E)(i)), and the extent to which minor's family, community environment, and childhood trauma affected his prior delinquent behavior (*id.*, subd. (a)(3)(C)(i)-(ii)). We review the evidence considered relevant by the court and conclude substantial evidence supports the juvenile court's "ultimate" finding that appellant is not amenable to rehabilitation within the time provided. (*In re E.P.*, *supra*, 89 Cal.App.5th at p. 416; see § 707, subd. (a)(3).)

### A.      Criminal Sophistication

Criminal sophistication (§ 707, subd. (a)(1)(A)) was one of the primary factors relied on by the juvenile court in determining petitioner was not amenable to rehabilitation while under juvenile court jurisdiction. In this regard, the juvenile court relied primarily on appellant's conduct while in JDF, rather than his conduct surrounding the charged offense. The court characterized appellant as "very manipulative" and as having a history of "deal[ing] with life using violence." The court noted appellant believed he should be treated differently than others at JDF because he is an adult. The court also stated that appellant "prey[s] on people that he feels are in a weaker position, and he does like to create himself as the victim in other situations." The court attributed this conduct to appellant's social history and upbringing, which required him to be resourceful to protect himself, but also noted that he had not used that resourcefulness to his benefit while in JDF.

We recognize that, apart from the murder, the record does not support the court's statement that appellant "deals with life using violence." No evidence was presented regarding appellant engaging in violence, other than his having committed the murder. Nonetheless, the record is replete with references to appellant's angry outbursts and instances in which he used threatening bodily language toward staff, particularly female staff. Appellant regularly reacted to redirection in an angry and threatening manner by talking back, refusing to follow directions, and kicking his door, among other behaviors. An institution supervisor testified that appellant reacted angrily toward female staff, to

whom he would posture in an intimidating manner. Valdivieso testified appellant was one of the few students she was fearful of over the course of her career, testimony to which the court gave substantial weight.

The court's reference to appellant's victim behavior appears to be a reference to the many assaults of which appellant was, in fact, a victim. Nonetheless, there was extensive and uncontroverted testimony that appellant verbally antagonized the gang members who attacked him.[15] He then attempted to elicit sympathy for being attacked due to his dropout status. The court noted that appellant was "creating situations . . . antagonizing people that he knows are going to respond in kind." At the very least, this behavior demonstrates appellant's inability to refrain from such provocative behavior. Furthermore, as the juvenile court stated, it demonstrates that appellant has not successfully employed his learned resourcefulness to his benefit during his time in JDF.

Based on the foregoing behaviors, the juvenile court found that appellant was manipulative and criminally sophisticated, to a degree that would prevent his rehabilitation while under the jurisdiction of the juvenile court. The cited evidence constitutes substantial evidence from which a reasonable trier of fact could have found it highly probable that this fact was true. (*Conservatorship of O.B.*, *supra*, 9 Cal.5th at p. 996.)

### B. Previous Attempts at Rehabilitation

The court also considered the ineffectiveness of appellant's prior attempts at rehabilitation as supporting a finding he could not be rehabilitated in the time available. (§ 707, subd. (a)(3)(D).)

The court first noted that appellant's prior performance on informal probation was not satisfactory. Although appellant was deemed to have successfully completed his

---

[15] There also was testimony that appellant was sometimes attacked unprovoked, and was picked on because he was a gang dropout and an adult who could not fight back without being charged.

41.

informal probation and obtained a satisfactory dismissal through DEJ, he was only minimally compliant with the terms and conditions of his probation. The court observed that appellant "did the bare minimum he had to do in order to get where he wanted to be," which the court noted was not "a good sign for his future success in this type of situation." The record supports this finding. For example, appellant did not maintain communication with his probation officer or notify the officer of his changed address as required, did not enroll in school until the end of his probationary term, and tested positive for drugs while on probation.

The court also noted that appellant's progress at JDF was limited. The testimony of numerous probation correctional officers corroborates that appellant has had difficulty conforming to the rules of the institution. Additionally, Valdivieso testified that appellant's behavior had not improved over the course of his time at JDF. Valdivieso believed that youth such as appellant, at 19 or 20 years old, should not require constant redirection because "they've [been] counseled enough from the school and facility to learn how to take a deep breath and just redirect themselves . . . ." We acknowledge that appellant has had limited access to programming while in JDF, a factor which the court did not expressly consider.[16] (See § 707, subd. (a)(1)(D)(ii) [court may give weight to "the adequacy of the services previously provided to address the minor's needs"].) Nevertheless, the record supports a finding that appellant failed to make meaningful progress in this regard and would require substantial additional time to rehabilitate.

A reasonable trier of fact could find that appellant's lack of progress makes it highly probable that he would be unable to achieve rehabilitation prior to the expiration of juvenile court jurisdiction.

---

[16] The record reflects that appellant received anger management counseling for a few months while on informal probation and was provided only minimal anger management counseling during his time at JDF.

## C. Previous Delinquent History and Current Offense

The juvenile court mentioned the circumstances and gravity of appellant's prior offense (§ 707, subd. (a)(1)(E)), but did not specifically relate this factor to appellant's amenability to rehabilitation. As all parties agree, murder is a serious offense. Nonetheless, based on the juvenile court's articulation of its reasoning, it does not appear this factor weighed heavily in the court's determination that appellant was not amenable to rehabilitation while under juvenile court jurisdiction.

The court also touched briefly on appellant's previous delinquent history, inasmuch as the court mentioned minor's family environment as a contributing factor to his behavior. (§ 707, subd. (a)(1)(C)(ii).) However, the court determined this factor weighed against rehabilitation, inasmuch as appellant's experience had taught him to be manipulative. As explained above, this finding is supported by substantial evidence.

## D. Effect of Expert Opinions

Appellant contends the above findings by the juvenile court "completely disregard the defense experts' assessment that appellant suffers from a neurocognitive disorder, a low IQ, and impaired learning and memory." We recognize that the defense experts gave testimony that was favorable to appellant. Under this more favorable view of the evidence, appellant successfully completed probation, dropped out of the gang, and obtained employment. He had no further adverse law enforcement contacts and committed no other crimes. After being detained on the instant offense, he spent approximately 18 months in custody without committing additional offenses. He did not commit violence against another while in custody. Although he was written up many times, many write-ups involved conduct such as hoarding food or using profanity, conduct which an expert opined was either normative for appellant's age or related to prior food insecurity. Appellant's more serious write-ups involve his angry and dysregulated response to redirection, which the expert tied to his intellectual disability and complex posttraumatic stress disorder. Moreover, the expert opined that appellant

43.

could be rehabilitated prior to the expiration of juvenile court jurisdiction through the structure afforded by SYTP and the services provided by Phoenix House. If credited, this testimony would require the juvenile court to retain jurisdiction over appellant rather than transferring him to criminal court.

The juvenile court did not discuss the expert testimony other than to state that it credited Valdivieso (a former special education teacher) over the defense experts with regard to appellant's need for an IEP, and to note that Valdivieso had spent more time with appellant than the experts had. However, it is plain that the juvenile court did not credit the expert's testimony that appellant could be rehabilitated prior to the expiration of juvenile court jurisdiction. As stated, the juvenile court was particularly concerned with appellant's behavior and his minimal rehabilitative progress to date, both factors which may have diminished the weight given to the expert's opinion. Moreover, it is clear the juvenile court found Valdivieso's experience highly persuasive.[17] We must give due deference to the juvenile court's determination that the expert's opinion was not persuasive on this point. (*Conservatorship of O.B.*, *supra*, 9 Cal.5th at p. 996.)

E.    Conclusion

The record contains substantial evidence from which a reasonable fact finder could have found it highly probable that appellant was not amenable to rehabilitation while under the jurisdiction of the juvenile court.

---

[17] Moreover, at the time of the transfer hearing, the SYTP program was comprised primarily of Norteño gang members. This may have affected the juvenile court's view of the efficacy of this program for appellant.

## **DISPOSITION**

The juvenile court's order transferring appellant to a court of criminal jurisdiction is affirmed.

DETJEN, Acting P. J.

WE CONCUR:


PEÑA, J.


MEEHAN, J.